MATTER OF PAUL

In DEPORTATION Proceedings

A-5142538

*Decided by Board December 27, 1963*

To sustain a charge of deportability under section 241(a)(6), Immigration and Nationality Act, the ultimate burden of proof rests with, and requires, the Government to overcome the possibility that membership in the Communist Party was devoid of political implications, since unexplained voluntary membership and activity therein over a period of time does not justify an inference of awareness of the political nature thereof (*Gastelum-Quinones* v. *Kennedy*, 374 U.S. 469 (June 17, 1963)).

CHARGE:

Order: Act of 1952—Section 241(a)(6) [8 U.S.C. 1251(a)(6) (1958)]—After entry, an alien who was a member of the Communist Party of the United States.

Respondent, a 67-year-old married male, a resident of the United States since his admission for permanent residence in 1922, has been the subject of two Board orders declaring him deportable on the charge stated above for membership in the Communist Party in 1950. The Service, although of the belief that respondent is deportable, moves the Board to evaluate the deportation record in light of the decision in *Gastelum-Quinones* v. *Kennedy*, 374 U.S. 469 (June 7, 1963). This evaluation is requested so that if decision as to deportability stands and respondent seeks judicial review, the court will have before it a deportation record which has been administratively considered in light of the latest Supreme Court pronouncement on the law involved. Counsel agrees that reconsideration is necessary but contends that the Board's evaluation of the record in light of the Court's decision should result in termination of proceedings. We have reconsidered the case and agree that *Gastelum-Quinones* requires termination of these proceedings.

Gastelum-Quinones, the petitioner, an alien about 53 years old, a resident of the United States since 1920, had been ordered deported on the same charge involved in the instant case, for membership in the Communist Party during 1949 and 1950. He did not testify at his

deportation hearing; two Government witnesses established that he had paid dues to the Party, that he had attended several Party meetings at the local level, that he had attended a Party convention, and that he attended a Party unit executive board meeting.

The Court (5-4) found the petitioner was not deportable. The Court's opinion reveals that the charge could not be sustained unless the Service eliminated "the possibility that the alien's joining was without understanding the nature of the Party as a distinct political unit," at 473. The Court, examining the record for direct or indirect proof that the petitioner possessed the requisite awareness, held that the Service had failed to bear its burden. As to direct proof, the Court found none to establish that the alien was aware the Party was a political organization, or that he was aware of the aims and purposes of the Party (knowledge of the Party's advocacy or violence is not required), or that he had knowledge of its international relationships. Indirect proof consisting of the fact that the petitioner had attended a Party convention, the Court characterized as deficient in that the Government witness "neither described what petitioner would have heard at the convention nor suggested that there was any prerequisite such as officership or executive responsibility to petitioner's attendance, at the convention." As the Government witness' testimony that at Party conventions "they would have discussions on what was going on in the Party, and what drives were coming up," the Court pointed out that the Government witness "did not elaborate this statement with reference to the convention that petitioner attended or to what petitioner did there." As to the Government witness' testimony, that petitioner had been present at a Party executive board meeting, that he 'supposed' that petitioner was a Party official, and that attendance was 'probably' limited to officials of the club, the Court stated that the witness "did not elaborate specifically upon the significance of petitioner's presence at the one meeting, making only the general statement that '[a]t this time I cannot say definitely the purpose [of that meeting] but it was either organizational or to form an agenda for the regular meetings'" (all quotations from note 6, at 477).

As to the alien's silence, the Court considering the slimness of the evidence, and the drastic sanction involved, ruled that evidence of awareness of the political nature must be based on something "more directly probative than a mere inference based on the alien's silence," at 479.

The dissenters concluded that Gastelum-Quinones was deportable. They pointed out that the evidence established that at conventions 'they would have discussions on what was going on in the Party, and what drives were coming up,' at 485. The dissenters stated, *ibid*:

432

After regular attendance at Party meetings and functions, and regular financial support for its activities, it is rather fanciful to believe petitioner was still unaware of the political nature of the Communist Party. It is doubtful that the meetings were so ineptly run or structured.

The Service contends that the following facts directly or indirectly support the finding or inference that the respondent was aware of the political nature of the Party:

The record establishes that the respondent presided at four or five closed meetings of the communist party at his apartment in 1949 or 1950; that he held frequent conversations with [government witness] Pikes regarding communist party affairs, during this period; that respondent stated he had been a member "quite a number of years" (p. 58); that the Stockholm Peace Petition as a Party function and device for recruitment of Party members was a subject of discussion; that communist party literature was discussed; that the respondent had tried to recruit furniture workers for the communist party; that as recently as 1957 the respondent helped arrange a meeting at his apartment with two communist party officials; that there was a discussion about communist party recruiting; that respondent was quoted as having stated he was disposed to leave a dinner at one time because two of the persons present "were deviating from the Party Line, and that they were not good Communists" (p. 76).

Counsel's contention, apart from attacks upon the credibility of the Government witness, is in brief that the Government witness' testimony concerning respondent's Party membership fails to establish that respondent was aware of the political nature of the Party or that respondent was an officer or had executive responsibility of an official nature. More specifically, counsel states that the record establishes not that respondent chaired the four or five Communist Party meetings at his home in an official position but rather that he was little more than a host in his own home. He is of the belief, that the record is deficient since it fails to show the substance of the conversations and the nature of the Party affairs discussed with the Government witness; that a simple admission of membership by respondent does not elucidate the character of the membership; that the concern with the Stockholm Peace Petition does not establish the political nature of the Party; that the effort to recruit workers to the Party was not shown to have resulted in success; that respondent's chance presence at a meeting between the Government witness and officials at which the Party's work in the North and South were discussed is no more evidence that the respondent was aware of the political nature of the Party than was Gastelum-Quinones' attendance at a Communist Party convention; and that respondent's characterization of two individuals as deviators from the Party line and bad communists was without significance in the absence of evidence as to what the Party line was or what constituted a bad communist. Counsel further contends the evidence fails to reveal the nature of Party activities or the nature of re-

433

spondent's work, except perhaps to show that respondent's efforts were to better working conditions among furniture workers or to carry out trade union objectives.

From this review, it is clear that the charge before us cannot be sustained unless the Service rules out the possibility that respondent's affiliation with the Party was devoid of political implications. We believe the Service has failed to sustain its burden. There is no direct proof in the record that the respondent was aware of the political nature of the Party; nor does the evidence justify an inference that respondent was aware of the Party's political aspect. Evidence that the respondent presided at four or five meetings in his apartment does not justify such an inference in absence of proof that respondent presided because he had an official obligation to do so, or that matters relating to the Party's political nature were discussed. Respondent's presence at the Party meetings and at the meeting with the Party officials is an aspect of membership which appears to differ little in quality from Gastelum-Quinones' attendances at Party meetings, the convention and the unit executive board meeting. The testimony of the Government witness fails to show participation in Party activities to such a degree that it would be fair to infer that the alien had to know the political nature of the Party.

Although we find the charge has not been sustained on this record we shall not terminate proceedings without affording the Service a chance to proceed further if it desires. Until *Gastelum-Quinones* was decided, the administrative view was that an alien's unexplained voluntary membership and activity in the Communist Party over a period of time justified an inference that he knew the political nature of the Party. Until *Gastelum-Quinones*, we were unaware of the degree of involvement required before such an inference was justified. Had the Service been aware of the standard which *Gastelum-Quinones* exacts, the Service presentation of its case might have been different. Therefore, if the Service wishes to offer further testimony as to the nature of the respondent's membership and activity, it may, within three months from the date of this order apply for reopening of proceedings to the special inquiry officer who held this hearing or his substitute. If application for reopening of proceedings is not made within the period, or authorized extension thereof, these proceedings shall be considered terminated.

ORDER: It is ordered that the outstanding order of deportation be and the same is hereby withdrawn.

*It is further ordered* that if the Service fails to move for reopening of proceedings within three months from the date of this order or any authorized extension thereof, the proceedings shall be considered terminated.